IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND )
*et al.*, )
 )
 ) Civil Action No.: 09 C 7201
      Plaintiffs, )
 ) Suzanne B. Conlon, Judge
v. )
 )
RAY C. HUGHES, INC. *et al.*, )
 )
      Defendants. )

## MEMORANDUM OPINION AND ORDER

  Related companies Gateway Ready-Mix, Inc. and Ray C. Hughes, Inc. were required by collective bargaining agreements to make pension contributions to Central States, Southeast and Southwest Areas Pension Fund, administered by trustee Arthur H. Bunte, Jr. In October 2008, Gateway and Hughes, Inc. effected a complete withdrawal from the pension fund, incurring withdrawal liability in the amount of $1,361,385.60, as calculated by the pension fund. Gateway and Hughes, Inc. are challenging the amount in arbitration. Meanwhile, neither Gateway nor Hughes, Inc. have made interim payments as required under the "pay now, dispute later" provision of 29 U.S.C. § 1399(c)(2). The pension fund and Bunte April 25, 2012(collectively "Central States") sued under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking a judgment against Gateway, and Hughes, Inc. for the total withdrawal liability, interest, an additional penalty, and attorneys' fees and costs. Additionally, Central States identified a third corporation, RARU Investment Corp., that it contends should be held jointly and severally liable for Gateway and Hughes, Inc.'s withdrawal liability. Central

1

States alleges that, although RARU did not make any contributions to the pension fund, RARU is a trade or business under common control with Gateway and Hughes, Inc. The parties cross-move for summary judgment on Central States' claim.

Gateway, Hughes, Inc., and RARU are all Missouri corporations owned in some combination by members of the Hughes family and the Ray C. Hughes Residual Trust. Pl. Facts [39] ¶¶ 2–4, 17–19; Def. Facts [41] ¶¶ 2–4, 17–19.[1] The parties do not state what type of business Gateway and Hughes, Inc. are, but it is uncontested that they are trades or businesses under common control and are jointly and severally liable for the withdrawal liability. Pl. Facts [39] ¶¶ 10, 16; Def. Facts [41] ¶¶ 10, 16. The parties are not as agreeable about RARU, a corporation that holds securities, notes, and one office building that it leases to tenants. Defendants contend RARU simply holds family investments for estate planning purposes and is neither under common control with Gateway and Hughes, Inc. nor a trade or business. More facts are provided below as necessary.

## I. ERISA and the MPPAA

Central States is a multiemployer pension plan. Under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1461, an employer who withdraws from the plan must pay withdrawal liability for unfunded vested pension benefits. *Central States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 767–68 (7th Cir. 2010). To protect the pension fund's solvency, the MPPAA holds all trades or businesses under common control with the withdrawing employer jointly and severally liable for

---

[1] Because there are several statements of fact, the court includes the docket number in brackets of the cited document.

the withdrawal liability. 29 U.S.C. § 1301(b)(1); *McDougall v. Pioneer Ranch Ltd. P'ship*, 494 F.3d 571, 574 (7th Cir. 2007). For RARU to be held responsible for Gateway's and Hughes, Inc.'s withdrawal liability, it must be (1) under common control with them and (2) a trade or business. *Pioneer Ranch*, 494 F.3d at 577. No economic nexus among the organizations is necessary. *Central States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 879 (7th Cir. 2011), *petition for cert. filed*, 80 BNA USLW 3572 (U.S. Mar. 26, 2012) (No. 11-1181); *Central States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 n.1 (7th Cir. 2001).

At summary judgment, the court views the evidence in a light most favorable to the non-moving party. *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012). Under this lens, summary judgment is appropriate if the record evidence reveals no genuinely disputed material fact for trial and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Rosario*, 670 F.3d at 820. Because the parties filed cross motions for summary judgment, the court must evaluate each motion by construing the facts against the non-moving party. *FTC v. Cleverlink Trading Ltd.*, 519 F. Supp.2d 784, 792 (N.D. Ill. 2007) (Kendall, J) (describing a "Janus-like" perspective on cross motions for summary judgment). Many of the facts here are undisputed. But for those that are disputed, the court draws reasonable inferences in favor of the non-movant.

**A. Common Control**

The MPPAA defines "common control" by reference to the definition of "common control" in the Internal Revenue Code, 26 U.S.C. § 414(c), and the accompanying regulations. 29 U.S.C. § 1301(b)(1); 29 C.F.R. § 4001.3; *SCOFBP, LLC*, 668 F.3d at 880–81. Central States contends the three entities are a "brother-sister group" under the regulations. *See* 26 C.F.R.

3

§ 1.414(c)–2(c). To be a brother-sister group, two conditions must be met. First, the same five or fewer entities (either individuals, estates, or trusts) must have a controlling interest in each corporation, defined as owning at least 80% of the stock of each corporation.[2] 29 C.F.R. § 1.414(c)–2(b)(2)(A), (c)(1)(I). Second, those same five or fewer entities must have effective control of each corporation, determined by taking each entity's lowest percentage of stock ownership among the corporations at issue and adding those lowest percentages together; a total greater than 50% is effective control. 26 C.F.R. § 1.414(c)–2(c)(1), (2). Ownership stakes held by trusts are considered owned by the trust beneficiaries who have an actuarial interest of five percent or more in the trust's interest in the corporation. *Id.* §§ 1.414(c)–2(c), 1.414(c)–4(b)(3). Each beneficiary's actuarial interest is determined "by assuming the maximum exercise of discretion by the fiduciary in favor of such beneficiary and the maximum use of [the trust's interest in the corporation] to satisfy the beneficiary's rights." *Id.* § 1.414(c)–4(b)(3).

The existence of a controlled group is determined as of the date of withdrawal from the pension fund. *SCOFBP, LLC*, 668 F.3d at 881. The ownership of Gateway, Hughes, Inc., and RARU on October 4, 2008, the date of withdrawal, and the relevant facts are uncontested. Gateway was owned 100% by Ruth Hughes. Pl. Facts [39] ¶ 17; Def. Facts [41] ¶ 17. Hughes, Inc. was owned 32% by Ruth Hughes, 4% by Steven Hughes, and 64% by the Ray C. Hughes Residual Trust (the "Hughes Trust"). Pl. Facts [39] ¶ 18; Def. Facts [41] ¶ 18. RARU was owned 4% by Ruth Hughes, 4% by Gail Lynne Schneider, and 92% by the Hughes Trust. Pl. Facts [39] ¶ 19; Def. Facts [41] ¶ 19. Without consideration of ownership attribution of the Hughes Trust's shares, the ownership is as follows:

---

[2] Each corporation here has only one type of stock, simplifying the ownership analysis.

|  | Gateway | Hughes, Inc. | RARU |
|---|---|---|---|
| Ruth Hughes | 100% | 32% | 4% |
| Steven Hughes |  | 4% |  |
| Gail Lynne Schneider |  |  | 4% |
| Hughes Trust |  | 64% | 92% |

The Hughes Trust was created pursuant to the will of Ruth Hughes' late husband, Ray C. Hughes, who died in 1991. Pl. Facts [39] ¶¶ 20–21; Def. Facts [41] ¶¶ 20–21. Under the terms of the trust, Ruth Hughes and First Bank & Trust were appointed trustees. Pl. Facts [39] ¶ 24; Def. Addt'l Facts [47] ¶ 1. Ruth was the only lifetime beneficiary. Pl. Facts [39] ¶ 26. First Bank & Trust was directed to pay Ruth the net income from the trust. Pl. Resp. to Def. Addt'l Facts [51] ¶ 2. First Bank & Trust also had the authority to draw upon the principal in its sole discretion to, among other things, "provide liberally for [Ruth Hughes] so that she may maintain herself in her proper and accustomed station of life." Pl. Facts [39] ¶ 25. The terms of the trust, therefore, allow First Bank & Trust to consume the trust's entire interest in Hughes, Inc. and RARU in favor of Ruth, making its shares attributable to her. *See Central States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 738 F. Supp. 2d 840, 846 (N.D. Ill. 2010) (Pallmeyer, J.) ("Cappy is presumed to have had a near 100 percent actuarial interest in the MLC Family Trusts' assets because nothing in the trust documents limits the trustees' discretion to use all of trust assets for Cappy's benefit"), *aff'd*, 668 F.3d 873 (7th Cir. 2011). Attributing the Hughes Trust's shares to Ruth Hughes results in the following ownership percentages:

|  | Gateway | Hughes, Inc. | RARU |
|---|---|---|---|
| Ruth Hughes | 100% | 96% | 96% |
| Steven Hughes |  | 4% |  |
| Gail Lynne Schneider |  |  | 4% |

Under this analysis, Ruth Hughes owns a controlling interest of more than 80% of each corporation. She also has effective control because her lowest ownership percentage of 96% exceeds the 50% requirement. Gateway, Hughes, Inc., and RARU were under common control.

**B. Trade or Business**

In addition to common control, RARU must also operate as a trade or business. The MPPAA does not define "trade or business." The Seventh Circuit adopted the test from *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987), relating to whether a taxpayer's activities constituted a "trade or business" for certain tax purposes, to distinguish a trade or business from investment activities or hobbies.[3] *Fulkerson*, 238 F.3d at 895. The *Groetzinger* test looks to whether RARU's activities were (1) for the primary purpose of income or profit and (2) continuous and regular. *Groetzinger*, 480 U.S. at 35; *Fulkerson*, 238 F.3d at 895. Defendants maintain that RARU simply holds investments for estate planning purposes and is not a trade or business.

**1. Income or Profit**

Two cases provide helpful illustrations about the difference between operating for income

---

[3] Central States argues that the *Groetzinger* test does not apply to formal business entities, such as corporations like RARU. Central States urges this court to designate RARU as a *per se* trade or business based on its incorporated status. After briefing was completed in this case, the Seventh Circuit explicitly rejected Central States' argument and applied the *Groetzinger* test to a corporation. *SCOFBP, Inc.*, 668 F.3d at 878.

6

or profit and operating for personal reasons. In *Pioneer Ranch*, the defendant contended Pioneer Ranch, where ranching and farming activities were conducted, was primarily used for personal reasons as a vacation home, and the limited partnership encompassing the ranch was created for estate planning purposes. 494 F.3d at 577–78. The Seventh Circuit concluded on clear error review that the documentary evidence was sufficient evidence of intent to allow a reasonable factfinder to conclude the ranch's primary purpose was income or profit, and the personal benefit was secondary. *Id.* at 578. The documentary evidence included the partnership agreement, which stated a purpose "to engage in the business of farming, ranching, and any agricultural pursuit or undertaking," and the owner's tax returns, which claimed business exemptions and deductions for farming expenses, reported an annual income of $20,000, and stated its principal business activity was cattle farming. *Id.* at 578.

By contrast, in *White*, the Seventh Circuit suggested without deciding that the primary purpose the Whites rented apartments above their garage was not for income or profit but rather for the added security the tenants' presence gave to Mrs. White, whose husband traveled frequently. *Central States, Se. & Sw. Areas Pension Fund v. White*, 258 F.3d 636, 638, 643 (7th Cir. 2001). The apartments were already on the property when the Whites purchased the house, and there was no evidence the apartments were a substantial factor when they bought it. *Id.* at 643. The Whites initially rented the apartments only because they agreed to honor the leases the previous owner had made, and they never formally incorporated. *Id.* Personal security was deemed to be a likely primary reason to rent out apartments, with income or profit only secondary.

Defendants argue the primary purpose of RARU is "to own and invest family estate assets

7

rather than generate regular income or profits." Def. Resp. in Opp. to SJ [46] at 6. They point out that for the past 38 years, RARU's only assets were securities and notes—well-recognized passive investments—and one real estate property. However, RARU's facts do not create a genuine issue about whether RARU's primary purpose was income or profit. As the Seventh Circuit noted, even passive investing like "the holding of investments . . . will normally satisfy the first prong of *Groetzinger* since the purpose is to produce income." *Fulkerson*, 238 F.3d at 897. Real estate activity need not even produce a net gain for its primary purpose to be for income or profit because the activity could increase equity, appreciate value, or generate tax deductions. *SCOFBP, LLC*, 668 F.3d at 878. Having the proceeds go towards building up the family estate, rather than towards paying dividends to the shareholders or salaries for employees, does not create a dispute about whether RARU's purpose was to create income or profits, which, incidentally, would increase the size of the family estate.

The facts are more analogous with *Pioneer Ranch* than with *White*. RARU's articles of incorporation state its purpose in part is "to carry on a general trucking and contracting business and to that end . . . to purchase or otherwise acquire, hold, own, maintain, work, develop, sell, lease, exchange, hire, convey, mortgage or otherwise dispose of and deal in lands and leaseholds, and any interest, estate and rights of real property." Pl. Addt'l Facts [44] ¶ 4. When RARU was first incorporated, it was named Builder's Hauling Company. Pl. Facts [39] ¶ 28. Even after the articles of incorporation were amended to change the name to RARU Investment Corp., the stated purpose referred to a trucking and contracting business. Pl. Addt'l Facts [44] ¶ 4. On RARU's tax forms, its principle business activity was listed as lessor. Pl. Facts [39] ¶ 34. Finally, unlike the Whites, whose ownership of the rental apartments was incidental to owning

their home, RARU's ownership of the parcel of land was intentional, and RARU made improvements to the land over time. It purchased the land as a vacant lot in 1965. Def. Facts [41] ¶¶ 27–28. In 1973 or 1974, RARU built a commercial office building on the property and began leasing the offices in 1974. *Id.* ¶¶ 27, 29. In the mid-1980s, a second floor was added to the building, increasing the total number of tenants to six. *Id.* ¶¶ 27, 31, 34–35. These activities distinguish this case from the incidental ownership in *White*.

### 2. Continuous and Regular Activity

The second requirement—continuous and regular activity—serves to distinguish investments from businesses. *Fulkerson*, 238 F.3d at 895. Mere possession of property without more does not establish continuous and regular activity. *Id.* at 895–96. Courts look at actions related to the property, such as negotiating leases, researching properties, and maintaining or repairing properties. *Id.* at 895.

In *Fulkerson*, the Seventh Circuit concluded a reasonable factfinder could find that a total of five hours a year dealing with rental property was not sufficient for an individual's rental activities to constitute continuous and regular business activity. *Id.* at 896. Over a period of ten years, Fulkerson bought three properties and sold two. *Id.* at 893. The land was leased under "triple net leases," which made the tenant responsible for traditional landlord obligations, such as maintenance, operating expenses, real estate taxes, and insurance. *Id.* Fulkerson's role as landlord was basically limited to depositing the rent checks and making mortgage payments. *Id.*

Similarly, in *White*, the Seventh Circuit determined the Whites' actions regarding the rental apartments above their garage was similar to that in *Fulkerson*, except they performed more upkeep, which the court deemed legally insignificant. 258 F.3d at 643. The property

maintenance, routine repairs, and cleaning done to the garage apartments could not be separated from the normal upkeep the Whites would do to their home anyway because the garage apartments were part of their primary residence. *Id.* at 643. These personal activities were not counted towards the continuous and regular requirement. *Id.* at 643–44.

On the other end of the spectrum, the real estate activities by defendant Perrelle in *Personnel, Inc.*, was found to be continuous and regular. *Central States, Se. & Sw. Pension Fund v. Personnel, Inc.*, 974 F.2d 789 (7th Cir. 1992). Perrelle bought and sold several properties each year, leased several properties yearly, received rents, and deducted expenses on his tax returns. *Id.* at 794–95.

Although the Seventh Circuit stated that formal business entities are not *per se* trades or businesses, in practice, corporations have been found to satisfy the *Groetzinger* test based on factors common to nearly all corporations. The facts here are indistinguishable from those in *SCOFBP, LLC*, which concluded that MCRI, LLC was a trade or business and not a personal investment. 668 F.3d at 879. MCRI was a limited liability company that leased property under triple-net leases to a third-party company. *Id.* at 877–78. The Seventh Circuit relied on the following factors when determining MCRI was a trade or business: (1) MCRI was a for-profit LLC; (2) MCRI earned rental income, paid business management fees, and claimed business-related income deductions on its federal income tax returns; (3) MCRI possessed a Federal Employer Identification Number; (4) MCRI had no employees, but contracted with professionals to provide legal, management, and accounting services; (5) MCRI's operating agreement stated that its primary purpose was generating income or profit, specifically "to hold real estate and investments approved by the Manager." *Id.* at 877, 879. The Seventh Circuit decided MCRI's

10

activities were more like the limited partnership in *Pioneer Ranch*, than the situations in *Fulkerson* or *White*, which the court characterized as presenting "unusual situations that tested the outer bounds of the 'personal investment' concept." *Id.* at 879; *see also Central States Se. & Sw. Areas Pension Fund v. Messina Trucking, Inc.*, – F. Supp. 2d –, No. 10 C 355, 2011 WL 4496084, at *5–6 (N.D. Ill. Sept. 27, 2011) (Dow, J.) (LLC was a trade or business even though it may not have owned real estate at the time of withdrawal because the LLC's tax return included a Federal Employer Identification Number, listed real estate rental as its principal business activity, and included income and expenses; the operating agreement stated "Members have adopted a business plan for the development of properties and for the production, sale and marketing of gravel . . ."; and the LLC's paperwork, annual reports, and bill paying was handled by an employee of the company that withdrew from the pension fund and incurred the withdrawal liability).

Just as in *SCOFBP, LLC*, RARU is a for-profit corporation, and its articles of incorporation state a purpose

> to purchase or otherwise acquire, hold, own, maintain, work, develop, sell, lease, exchange, hire, convey, mortgage or otherwise dispose of and deal in lands and leaseholds, and any interest, estate and rights of real property . . . to improve, manage, develop, sell, assign, transfer, lease, rent, mortgage, pledge, or otherwise dispose of, or, in turn, to act or deal with all or any part of the property of the corporation . . . and to have all rights and privileges in this state and in the United States and foreign countries, which accrue to manufacturing and business corporations under the laws of the States of Missouri and under the laws of such other states and foreign countries.

Pl. Facts [39] ¶ 29. RARU earned rental income, paid business management and professional fees, and claimed business-related income deductions on its federal income tax returns. *Id.* ¶ 35. RARU is a C corporation and possesses a Federal Employer Identification Number. *Id.* ¶ 33;

11

Def. Facts [41] ¶ 23. This is enough under *SCOFBP, LLC* to conclude RARU is a trade or business, without even considering the activities of Steven and Ruth Hughes.

Defendants advance two primary arguments against finding RARU was a trade or business. First, they argue filing tax returns and possessing a Federal Employer Identification Number are legally irrelevant because every corporation that earns income—business income or not—must file a federal tax return. Additionally, every income-generating corporation must apply for a Federal Employer Identification Number, which is simply an identification number for corporations. This argument is not persuasive because it applies with the same force to the entities at issue in *SCOFBP, Inc.* and *Messina Trucking*, but those entities were still considered trades or businesses.

Second, defendants contend RARU did not report any business income on its tax return. It is unclear what defendants mean by this. They do not explain what they mean by "business income." RARU's 2008 tax return (which is representative of the others) reported income from interest, rents, and a state tax refund, for a gross income of $287,960 (which amounted to $117,732 of taxable income after deductions). Pl. Ex. B [39] at Ex. 3. A real estate business would have income primarily from rent and not the other categories of income. If defendants are referring to the difference between passive activity and business activity for tax purposes, *see* 26 U.S.C. § 469, they are off the mark. The Seventh Circuit cautions courts not to automatically apply tax code cases when determining liability under the MPPAA. *Fulkerson*, 238 F.3d at 895 n.2. No MPPAA case has hinted at requiring, as defendants suggest, a 500-hour threshold before rental activity becomes continuous and regular activity, and the court declines to create a 500-hour test. Although defendants dispute the significance of these aspects of a corporation, "parties

are responsible for whatever legal consequences attach to their own choice of business organization." *Pioneer Ranch*, 494 F.3d at 578 n.4.

Even if the above analysis were not determinative, consideration of the activity taken on behalf of RARU supports a finding of continuous and regular activity. The parties dispute whose activity should be counted, among Steven Hughes, Ruth Hughes, and the several contractors who worked on the property. When a corporation is the landlord, it is appropriate to consider all the actions taken on behalf of the landlord to fulfill the landlord's duties under the lease, but not any action unrelated to the landlord. *See Central States, Se. and Sw. Areas Pension Fund v. Nagy Ready Mix, Inc.*, No 10 C 358, 2011 WL 3021524, at *5 (N.D. Ill. July 22, 2011) (Aspen, J.) ("[T]he proper inquiry involves review of all 'activities taken with regard to the property'" (quoting *Fulkerson*, 238 F.3d at 895)); *see also id.* at *5–6 (individual leased land to company he owned and was the president of; court distinguished between actions taken as landlord and actions taken as tenant).

The facts taken in a light most favorable to defendants show continuous and regular activity on behalf of RARU. RARU had no employees but paid Gateway a management fee of approximately $20,000 a year to manage the property. Pl. Facts [39] ¶¶40–42. Steven and Ruth Hughes, who each received a salary from Gateway, carried out the management duties. *Id.* ¶ 43; Def. Facts [41] ¶ 37. They estimate spending about 50 hours a year, collectively, overseeing and managing the RARU property, which is more than the five hours in *Fulkerson*, but less than the activity in *Personnel*. Def. Facts [41] ¶¶ 38–39.

Ruth's tasks included receiving rent checks, making deposits, and furnishing information to tax preparers. Def. Facts [41] ¶ 39. RARU did not have its own telephone number; tenants'

13

telephone calls went to either Ruth's home telephone or Steven's cell phone, and Steven would handle the tenant's requests. *Id.* ¶ 25; Pl. Facts [39] ¶ 45. These calls occurred once every couple of weeks. Def. Facts [41] ¶ 51. Steven's other tasks included negotiating leases, light maintenance work, and calling contractors or plumbers to do heavier maintenance. *Id.* ¶ 40. Steven mowed the grass at the property every week in April, every two weeks in June, and once a month in September for 10 to 15 minutes each time, and he performed other lawn care activities. *Id.* ¶ 53; Pl. Facts [39] ¶ 44. There had been only one new tenant in the past ten years; to find that new tenant, Steven called RARU's realtors and spoke to them for 5 to 10 minutes. Def. Facts [41] ¶¶ 42–43; Pl. Resp. to Def. Facts [45] ¶ 42. He otherwise had no contact with the realtors. Def. Facts [41] ¶ 44. The leases were generally negotiated and drafted by realtors, but Steven would often negotiate and draft the addendums to RARU's leases, spending about 5 to 10 minutes on each one. *Id.* ¶ 45; Pl. Facts [39] ¶ 47. Steven would locate and correspond with contractors about work to be performed on the property, and he would review the work once it was completed. Pl. Facts [39] ¶ 46. When a contractor was needed, Steven was able to find one quickly because he had them on speed dial. Def. Facts [41] ¶ 49. Steven did not visit the property regularly; he has gone three weeks at a time without visiting. *Id.* ¶ 52. These facts show Steven and Ruth were on call for the tenants and were responsible for coordinating a significant amount of the maintenance work at the property.

In addition to the services Steven and Ruth Hughes performed themselves, Steven contracted with a cleaning company to clean the property three times a week. Pl. Facts [39] ¶ 48. RARU also hired a service to remove snow in the winter. Def. Facts [41] ¶ 57. This activity is attributable to RARU because RARU assumed responsibility to ensure the building remained

14

clean and the lot was clear of snow.

Defendants focus on the form of the leases as evidence that the real estate should be treated like a passive investment.[4] Defendants characterize the leases as "net leases," which they define as one in which "the landlord factors into the initial base rent, the cost of utilities, insurance, real estate taxes and maintenance, and then provides for an increase in the rent, thorough [sic] an escalation clause, for any increases in these expenses that may relate to taxes and insurance." Def. Facts [41] ¶ 54. However, the type of lease used is not determinative. The focus of the inquiry is on the respective duties of the landlord and tenant, not who pays for particular expenses. Triple net leases often arise in MPPAA cases because under those leases, a landlord usually has no obligations, except perhaps paying the mortgage. *See Fulkerson*, 238 F.3d at 893; 1 COMMERCIAL REAL ESTATE LEASING § 4:2 (2d ed.). But characterizing a lease as a net or triple net lease is not a magic bullet that allows a court to overlook the landlord's duties under the lease.

The evidence shows RARU had more obligations than simply paying the mortgage. RARU paid the utilities for the second-floor tenants and factored the expenses into the base rent.

---

[4] Defendants submitted an expert report by Certified Public Accountant Harris Widmer that discusses, *inter alia*, the leases on the property. Central States moves to strike the expert report on the grounds that the report opines on legal questions that are to be decided by the court and is not helpful to the trier of fact. Under Fed. R. Evid. 702, one requirement for expert testimony is that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony may not contain outcome-determinative legal conclusions. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Widmer's opinion that RARU's rental income was properly characterized as passive activity under 26 U.S.C. § 469 is stricken as irrelevant because, as discussed above, the § 469 passive activity rules are inapplicable to the trade or business analysis under the MPPAA. Widmer's opinions about whether RARU's possession of real estate constitutes a trade or business are stricken because that is a question reserved for the court. Widmer's opinion about rental leases is relevant and helpful information.

Def. Facts [41] ¶ 55. (The first-floor tenants paid their own utilities. *Id.* ¶ 55.) RARU contracted and paid for repairs, improvements, and maintenance to the property, including HVAC repairs, architectural work, lock changing, roof work, general building repair, snow removal, duct cleaning, light bulbs, leaking window repair, new wall installation, painting, and new carpet installation. Pl. Facts [39] ¶¶ 57, 59. RARU retained Partee Associates to reduce real estate taxes and costs to benefit the tenants, who were assessed for the increases in real estate taxes. Def. Facts [41] ¶ 58. RARU issued 157 checks in 2005, 169 checks in 2006, 158 checks in 2007, and 168 checks in 2008, averaging out to about three per week. Pl. Facts [39] ¶ 62. RARU argues these activities should not be counted because under the terms of the net lease, the tenants were responsible for covering these costs as part of their rent. Def. Facts [412] ¶¶ 56–57. But regardless who pays for an expense, RARU is responsible for getting the work done.

RARU's obligations distinguish this case from the passive lease holdings in *Fulkerson* and *White*, even though RARU is later reimbursed for their activities under the tenants' net leases. The evidence taken in a light most favorable to defendants does not create a genuine issue of fact regarding continuous or regular activity.

## II. Conclusion

Central States' motion for summary judgment is granted. Gateway, Hughes, Inc., and RARU's cross-motion for summary judgment is denied. Gateway, Hughes, Inc., and RARU are jointly and severally liability for the withdrawal liability. Central States shall submit an appropriate judgment order by May 18, 2012.

ENTER:

April 30, 2012

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge